* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gillen and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * * *Page 2 RULINGS ON EVIDENTIARY MATTERS
On May 5, 2006, plaintiff filed a Motion to Request Entry Upon Land before Deputy Commissioner Gillen. Plaintiff requested an opportunity to "inspect [defendant-employer's] premises, photograph the premises, and view the premises in preparation for a hearing in this matter." Defendants replied, arguing that plaintiff did not follow the proper procedures under North Carolina Industrial Commission Rule 609 and Rule 34 of the North Carolina Rules of Civil Procedure, in that that plaintiff failed to "specifically describe what location and/or item is to be viewed, inspected or photographed." The Deputy Commissioner denied plaintiff's motion. The Full Commission finds that plaintiff was not prejudiced by the denial of the motion and that Deputy Commissioner Gillen properly denied plaintiff's motion.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act and are under the jurisdiction of the North Carolina Industrial Commission.
2. An employer-employee relationship existed between defendant-employer and Johnny James Johnson (hereinafter "decedent") on the alleged date of injury.
3. Defendant-employer is self-insured and self-administered.
4. Decedent's average weekly wage is $936.50, yielding a compensation rate of $624.37 per week.
 5. Decedent died on April 8, 2004. *Page 3 
6. Decedent's last day of work for defendant-employer was in February 2004, and that was also decedent's alleged last injurious exposure.
7. The following items were entered into evidence at the Deputy Commissioner's hearing:
 a. The Pre-Trial Agreement, marked as stipulated exhibit 1.
 b. Industrial Commission Forms, discovery responses, and motions, marked as stipulated exhibit 2.
 c. Decedent's medical records in three large binders, marked collectively as stipulated exhibit 3
 d. Pictures of defendant's Plant B, marked as plaintiff's exhibits 1 and 2.
 e. Work gloves identified as those worn by decedent, marked as plaintiff's exhibit 3.
 f. The medical records of witness Rebecca Durant, marked as plaintiff's exhibit 4.
 g. Pictures of defendant's Plant D, marked as plaintiff's exhibits 5, 6, 7, and 8.
 h. A vendors list of defendant, marked as plaintiff's exhibit 9.
 i. MSDS Sheets, marked as defendant's exhibit 1.
 j. Defendant's air quality permit and related documents, marked as defendant's exhibit 2.
 k. An air quality report on defendant's Rub and Pack department and related documents, marked as defendant's exhibit 3.
 l. An employee exposure assessment of the Rub and Pack department, marked as defendant's exhibit 4. *Page 4 
8. The issues before the Full Commission are whether decedent sustained a compensable occupational disease under the North Carolina Workers' Compensation Act resulting in his death; and, if so, what benefits, if any, plaintiff is owed.
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT 1. Decedent began working for defendant in 1965. He worked in various positions until March 2, 2004. At the time of his death on April 8, 2004, decedent was a supervisor in the Rub and Pack Department.
2. The Rub and Pack Department was a final manufacturing area through which furniture passed prior to being shipped to retail facilities. Furniture in the Rub and Pack Department had already been processed, manufactured, assembled, and stained. Although some chemicals were used in this department, the department also completes tasks that did not involve chemicals, such as installing glass and hardware on furniture to be shipped. Windex, spray lacquer, furniture polish, lacquer thinner, wood stabilizer, and liquid PVAC adhesive were used to some degree in defendant's Rub and Pack Department.
3. Plaintiff was diagnosed with diabetes mellitus Type II in December 2001. Also in 2001, plaintiff was diagnosed with sleep apnea to the extent that he required an airway pressure machine to sleep.
4. In early 2004, decedent began experiencing fatigue, weight loss, joint pain, balance problems, and anemia. On March 3, 2004, decedent was admitted to Thomasville Medical Center due to diffuse myalgias, swelling of the hands and fingers, discoloration in the palms of his hands, *Page 5 
weight loss, chills, night sweats, feelings of nighttime fever, and chest pain. At the time of his admission, decedent was already suffering from diabetes mellitus Type II and sleep apnea.
5. Decedent was released from the hospital on March 6, 2004, with discharge diagnoses of anemia, weight loss, fever, chills, myalgias, ischemic heart disease with positive stress tests, atrial hypertension, diabetes mellitus Type II, pulmonary fibrosis, and sleep apnea.
6. On March 8, 2004, decedent returned to Thomasville Medical Center due to ongoing medical problems and he was transported to North Carolina Baptist Hospital (hereinafter "Baptist Hospital"). A variety of tests were performed on decedent, but no specific diagnosis was made. During his admitting interview at Baptist Hospital, decedent was questioned about the causes of his illness and decedent denied being exposed to any harmful chemicals or irritants at either home or at work.
7. While hospitalized, decedent developed organ failure, experienced several episodes of cardiac arrests, and became ventilator-dependent. Decedent died on April 8, 2004, with multiple diagnoses that included methicillin-resistant staphylococcal aureus infection and cytomegalovirus. Despite exhaustive workups, no definitive diagnosis was given that explained the cause of decedent's illnesses, multi-organ failure, or death. None of decedent's treating physicians were deposed.
8. Neither Dr. Oscar Blackwell nor the doctors at Baptist Hospital recorded any suspicions that plaintiff's condition might have a work-related toxilogical cause.
9. On April 9, 2004, an autopsy was completed that listed anatomical findings of diffuse alveolar damage, emphysema, methicillin resistant staphylococcal aureus, cytomegalovirus, cardiomegaly, artrionephrosclerois, and coronary artery arterio scleorosis. The autopsy also noted that bacterial infection, viral infection or both might have been the etiologic agent of the diffuse alveolar damage. No toxicological disease was mentioned. Decedent's death certificate lists plaintiff's immediate cause of death as asytole-related multi-organ failure. *Page 6 
10. The medical records of Dr. Blackwell failed to show that decedent had experienced chronic pulmonary problems or a single episode of pneumonia prior to his acute illness in 2004.
11. None of decedent's treating physicians indicated that decedent's organ failure or death were in any way causally related to his work environment or any agent, chemical, or substance in his work environment. Decedent was never diagnosed with an autoimmune disorder or disease.
12. A known cause of chronic emphysema is cigarette smoke. Decedent had discussed with Dr. Blackwell that he was exposed to second-hand cigarette smoke.
13. Dr. Henry Simmons, the Director of the University of Arkansas Poison Control Center and a physician who also holds a Ph.D. in Toxicology, testified that decedent's work environment at defendant did not contribute to or cause any medical condition that decedent acquired in early 2004 and from which he died on April 8, 2004. Dr. Simmons had a complete set of decedent's medical records that he reviewed prior to formulating his opinion.
14. Dr. Theron Blickenstaff, a physician and certified toxicologist, has 20 years of experience in the field of medical toxicology, having previously been employed to write MSDS sheets for Eastman Chemical Company. Dr. Blickenstaff testified that decedent's work environment did not cause or significantly contribute to decedent's illness or the condition from which he died on April 8, 2004. Dr. Blickenstaff had a complete copy of decedent's medical records that he reviewed prior to formulating his opinion. Dr. Blickenstaff also testified that chemical exposure is not associated with the development of autoimmune disease and that chronic *Page 7 
exposure to respiratory irritants does not cause silent chronic obstructive pulmonary disease, as alleged by Dr. Allan Lieberman.
15. Dr. Lieberman, a medical doctor who practices environmental and occupational medicine, prepared two reports for decedent in this matter, one in January 2006 and a second in March 2006. Each report claimed that decedent developed an illness or disease caused by the chemicals in his workplace. However, Dr. Lieberman did not identify which chemical he believed caused decedent's illness and in each report the identity of the alleged illness or disease changed.
16. During his deposition on December 7, 2006, Dr. Lieberman stated that wood dust was the cause of decedent's occupational disease rather than the chemicals that were present in decedent's workplace, as he had previously reported. Neither of Dr. Lieberman's reports mentioned wood dust as a cause of decedent's illness. Dr. Lieberman admitted that he was not fully prepared when he compiled his reports and could not even testify that he reviewed decedent's full medical records prior to preparing either report. Although Dr. Lieberman focused on wood dust as the cause of decedent's illness during his deposition, he admitted that he did not know the nature of decedent's job or how much contact decedent had with wood dust. Further, he did not know what kind of wood was used at defendant's facility.
17. Although Dr. Lieberman testified that decedent suffered from hypersensitivity pneumonitis, such illness was considered and discarded by the treating physicians at Baptist Hospital. The treating physicians at Baptist Hospital immunosuppressed decedent with high doses of steroids to determine whether he was suffering from a hypersensitivity disorder. However, such procedure did not alter decedent's condition, and his physicians did not include any hypersensitivity disorder in decedent's final diagnosis. *Page 8 
18. In June 2006, Trigon Engineering Consultants of Charlotte, North Carolina conducted air quality studies in defendant's Rub and Pack Department. Ms. Christine Brenk, a licensed engineer and Certified Hazardous Materials Manager, conducted two air quality tests at defendant's Rub and Pack Department to determine the employees' exposure to chemicals and dust. Dates were selected to perform the tests when the concentrations of chemicals and dust in the air would be at their worst based upon the production, workload, and procedures being used. The air quality tests indicated that, on the dates taken, the air quality within the Rub and Pack Department was within OSHA regulatory standards for both chemicals and dust. Defendant's lay witnesses testified that the conditions in the Rub and Pack Department on the test days were approximately the same or similar to the conditions in 2004 and earlier when decedent worked in that facility.
19. Defendant's facility was under substantial government regulation from multiple agencies with regard to air quality and was subject to surprise inspections. There is no evidence that defendant ever received a fine, citation, or other sanction from any agency as a result of substandard air quality.
20. Rachel Fountain, R.N. testified that decedent's work environment caused his illness and ultimate death. However, Ms. Fountain was not educated, trained, or experienced in toxicology and is not a medical doctor.
21. John Chapman holds a Ph.D. in organic chemistry but was not trained, educated, or experienced in either medicine or toxicology. Without reviewing decedent's medical records or knowing the illnesses with which decedent was diagnosed, Dr. Chapman rendered an opinion that decedent's work environment caused his occupational illness and death. Neither Dr. *Page 9 
Chapman nor Ms. Fountain identified a specific chemical or irritant alleged to have caused decedent's condition.
22. Having considered the testimony of Ms. Fountain, Dr. Chapman, Dr. Lieberman, Dr. Simmons, and Dr. Blickenstaff, along with their methodologies, as well as their relative expertise and experience in the field of toxicology and medical science, the Full Commission gives greater weight to the testimony and expert opinions of Dr. Simmons and Dr. Blickenstaff than to Dr. Lieberman, who offered multiple opinions based on incomplete data. The Full Commission gives less weight to the opinions of Ms. Fountain and Dr. Chapman.
23. The Full Commission finds that there is insufficient evidence to find by the greater weight that decedent's employment with defendant placed him in a position of greater risk than the general public of contracting a compensable occupational disease or that decedent's employment with defendant caused him to develop a compensable occupational disease.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In workers' compensation cases, plaintiff has the burden of proving every element of compensability. As part of this burden, plaintiff must present convincing evidence establishing these elements, including expert medical testimony. Holly v. ACTS, Inc., 357 N.C. 228, 234,581 S.E.2d 750, 754 (2003); Harvey v. Raleigh Police Department,96 N.C. App. 28, 35, 384. S.E.2d 549, 553, disc. rev. denied, 325 N.C. 706,388 S.E.2d 454 (1989).
2. In order for an occupational disease to be compensable under N.C. Gen. Stat. § 97-53(13), plaintiff must prove that the disease is characteristic of individuals engaged in the *Page 10 
particular trade or occupation in which decedent was engaged, that the disease is not an ordinary disease of life to which the public is equally exposed, and that there exists a causal relationship between the disease and decedent's employment. N.C. Gen. Stat. § 97-53(13);Rutledge v. Tutlex Corp., 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983);Booker v. Duke Medical Center, 297 N.C. 458, 256 S.E.2d 189 (1979);Fann v. Burlington Indust., 59 N.C.App. 512, 296 S.E.2d 819 (1982).
3. Plaintiff has not proven by the greater weight of the evidence that decedent's employment with defendant placed him at greater risk than the general public of contracting a compensable occupational disease or that decedent's employment with defendant caused him to contract a compensable occupational disease. N.C. Gen. Stat. § 97-53(13);Rutledge v. Tutlex Corp., supra; Booker v. Duke Medical Center,supra.
4. Plaintiff's claim is not compensable under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. § 97-1, etseq.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. This claim must under the law be and is hereby DENIED.
2. Each side shall bear its own costs.
This 3rd day of December, 2007.
 S/______________________
 LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING: *Page 11 
S/______________________ BERNADINE BALLANCE COMMISSIONER
S/______________________ BUCK LATTIMORE COMMISSIONER *Page 1